UNTIED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Boston)

| | |
|---|---|
| In re: ) | |
| ) | |
| CONNOLLY, GEANEY, ABLITT & WILLARD, P.C. ) | CASE NO. 14-14164 |
| ) | |
| Debtor ) | CHAPTER 7 |
| ) | |
| _____ ) | |

**OPPOSITION TO OCWEN LOAN SERVICING'S MOTION
TO DISMISS INVOLUNUTARY BANKRUPTCY CASE**

NOW COMES, Steven A. Ablitt (Petitioner), petitioner, creditor and party-in-interest in this involuntary bankruptcy case.

**JURISDICTION AND STATUTORY PREDICATE**

1. Admitted. On September 4, 2014, Steven Ablitt, Summit Title Corporation, Etoile Corporation, and Pioneer & Abstract Company, LLC filed an involuntary petition ("Involuntary Petition") against Connolly, Geaney, Ablitt & Willard, P.C. (Debtor").

2. Admitted.

**INTRODUCTORY STATEMENT**

3. Admitted, that the law firm is no longer operating. The corporate officers, John Connolly, Kevin Geaney and Rachelle Willard have failed to take the necessary steps to properly unwind the law firm. The officers, among other things, have failed to conduct a final accounting, file corporate tax returns for 2013 and 2014, and reconcile the law firm's IOLTA accounts. There is no way for Ocwen Loan Servicing ("Ocwen") or any other creditor to determine the extent of the mismanaged or misappropriated funds, nor determine how many assets are still available or reachable under the law.

Admitted that Debtor gave substantial salaries, bonuses to its some of its officers, directors and employees. The extraordinary bonuses, included bonuses given to Robert Feige and Lawrence Scofield in the amount of approximately $350,000.00, payments made by the Debtor to the Massachusetts Department of Revenue for the benefit of John Connolly in the amount of approximately $60,000.00 and extraordinary healthcare payments in the amount of $15,000.00 for the benefit of Kevin Geaney. Further, even though Connolly & Geaney, LLC[1] was purchased by the Debtor, John Connolly and Kevin Geaney appear to have continued to invoice through the old firm and received payments therefrom.

Denied, in that Steven Ablitt was a named partner with the Debtor, Connolly, Geaney, Ablitt & Willard, PC. The debtor is a corporation and as such there are no "partners". There are officers, directors, shareholders and employees. Moreover, on May 16, 2013, Steven Ablitt resigned as on officer, director and shareholder of the Debtor

4.   Admitted. Ocwen filed a law suit against the Debtor, in which Steven Ablitt was named as a defendant in his individual capacity. Denied that Steven Ablitt is a partner of the Debtor.

5.   Admitted.

6.   Denied. The filing of the Involuntary Petition is completely unrelated to Steven Ablitt's responsibilities to file a response in the Florida complaint. Admitted, that the Debtor owes the Petitioning Creditors approximately $5.7 million in unsecured claims.

7.   Denied. The Involuntary Petition does not stop, delay or complicate any claims brought against Steven Ablitt in Florida. Steven Ablitt believes that there are significant

---

[1] See Assignment and Transfer of Power attached as **Exhibit A and Exhibit B**.

recoverable assets from the Debtor. Those assets may total in the millions of dollars.

8.  Denied. There is no "cause" to dismiss the Involuntary Bankruptcy under section 707(a).

## FACTUAL BACKGROUND

9.  Unable to admit or deny. The Petitioner has not had a chance to review the LCA and the Debtor's business records are not available for review.

10. Denied. The Debtor is a corporation and does not have "partners"[2]. The Petitioner has not been a shareholder, officer, or director of the Debtor since May 16, 2013. The Petitioner has been a consultant to the Debtor and has had no decision making authority with the Debtor since May 16, 2013 (See December email from John Connolly to Todd Barton and Michelle Davenport which articulates the Petitioners roll with the Debtor. **Exhibit "C"**). Under any definition, the Petitioner has not been a "partner" or decision maker with the Debtor since May 16, 2013.

11. Unable to admit or deny. The Petitioner has not had a chance to review the LCA and the Debtor's business records are not available for review. Admitted that the Debtor collected proceeds belonging to Ocwen.

12. Admitted, as to the preparedness to the on-site review. Unable to admit or deny when the Debtor notified Ocwen that it was suspending operations.

13. Unable to admit or deny the first time when Ocwen learned that the Debtor was unable to pay its employees or its cover its operating costs. In fact, the Debtor was able to cover

---

[2] The "term" partner is often confused with the officers and directors of the law firm. Even if the Court were to use the term "partner" in this context, the Petitioner was not an officer, director or shareholder, and as such is not a "partner".

its operating costs, but in June 2014, the officers started to divert all funds, staff, equipment and supplies from the Debtor's operations to C-G Law Group, DSL Law Group and Connolly & Geaney, LLC operations (See filing with the MA Secretary of the Commonwealth marked as **Exhibits D, E and F** respectively).

Denied, concerning the Debtors alleged insolvency since 2012. In 2012, the Debtor received $11,530,180.00[3] in legal fees alone and had a gross profit of $6,144,182.00 (See 2012 Tax Returns, **Exhibit G**). It appears that the diversion of funds and assets all happened in 2013 and 2014. In March 2013, the Debtor had approximately $5.8 million in accounts receivable, $3.8 million in work-in-progress and was generating approximately another $2.0 million in gross income every month. From March 2013 through July 2014, it is believed that in addition to the $9.6 million in account receivables and work-in-progress, the Debtor generated $28 million in new gross revenues for a total of $35.6 million. Ocwen alleges that an additional $1.6 million was taken from IOLTA and the Petitioner loaned the Debtor $1.07 million. Combining all sources of income, the Debtor appears to have had over $38.2 million of income disappear over the past 18 months. Moreover, there are additional funds that were diverted away from the Debtor by its officers and a single creditor (See checks payable to Connolly & Geaney and C-G Law Group, **Exhibit H**).

14.    Denied. The Petitioner is unaware of any reconciliation or accounting of any kind that was conducted by the Debtor. Ocwen is relying on documents provided to it by the Debtor. As such, the Petitioner is skeptical that there can be any certainty relating to the mismanagement of funds.

---

[3] Historically, for every dollar in fees earned, the Debtor would also collect approximately $1.30 in vendor costs. As a result, in 2012 the Debtor would have received an additional $14,989,234.00 for cost. The total amount of funds that the Debtor would have received in 2012 is approximately $26,519,414.00.

15. Unable to admit or deny. The Petitioner does not know when the "partners" of the Debtor first discovered the Iolta issues. On August 28, 2013, the Petitioner was not an officer, director or voting shareholder of the Debtor and at that time was working as a consultant to the Debtor.

16. Unable to admit or deny.

17. Unable to admit or deny.

18. Denied. The Petitioner believes the Debtor ceased doing business at the end of May 2014. On June 5, 2014, the officers of the Debtor and Craig McGrain of Durham Commercial Capital opened C-G Law Group or DSL Law Group. The officers of the Debtor and Craig McGrain diverted Debtor's assets to funds operations for C-G Law Group DSL Law Group and Connolly & Geaney, LLC.

19. Admitted.

20. Denied. Ocwen suggests that the Petitioner should not do everything it can do to recover, as best as possible, monies owed to him. The Involuntary Petition does nothing to intervene with the rights of the parties in the Florida Litigation. In fact, Ocwen could be a significant beneficiary of the Involuntary Petition.

## ARGUMENT

21. No response required.

22. No response required.

23. No response required.

24. No response required.

25. No response required.

26. Ocwen argues for dismissal of the Involuntary Petition under 707(a) of the

Bankruptcy Code. The only case Ocwen can cite, *In re Linehhan*, 326 B.R. 74 (Bankr. D. Ma. 2005) requires a showing of an abuse of chapter 7 or an egregious case of bad faith. Neither can be shown here. The Petitioner is not an officer, shareholder or director of the Debtor. The Petitioner is the holder of three notes, totally over $1.7 million (See **Exhibit I**). Petite Etoile gave a loan to the Debtor in the amount of $50 thousand (See **Exhibit J**) and Summit Title has outstanding receivables that total more than $4 million. There is approximately $38 million that is unaccounted for but was in the Debtor's possession over the past 18 months. The officers and directors decided to partnered with another creditor, Durham Commerical Capital and diverted income that may otherwise went to pay the Petitioner or other creditors.

27.     Ocwen continues to assert that the Petitioner is intending to gain some sort of strategic advantage in the Florida Litigation by filing the Bankruptcy Petition. However, Ocwen is unable to articulate what the Petitioner's advantage may be. That is because there isn't one. The Petitioner is not afforded any additional protection by this Bankruptcy Petition, nor does the Bankruptcy Petition stay or otherwise delay the proceedings in the Florida Litigation, at least as it relates to the Petitioner. The Petitioner has filed the Bankruptcy Proceeding for one reason and one reason only. The Petitioner has over $1.7 million in notes owed to him and he is an attempting to preserve or otherwise capture assets of the Debtor that currently exists or that were wrongfully diverted by the Debtor.

28.     Ocwen is wrong by asserting that Bankruptcy Petition is not for the benefit of the Petitioner. There is approximately $38 million in funds that are unaccounted for by the Debtor. Combined, the Petitioners are owed millions of dollar. There are other creditors that are in a similar position as the Petitioner. The Petitioner believes that there are reachable assets that can satisfy some, maybe all of the debts owed by the Debtor.

29.    Ocwen continues make allegations that are not supported with any specificity. Ocwen suggests that the loans from the Petitioner to the Debtor in the amount of $955,852.64[4] is "highly suspect". The loans are supported by loan documents, executed by the officers of the Debtor and are witnessed. The funds in the amount of $955,852.64 were deposited into the Debtors account. Similarly, Etoile Corporation, at the request of the Debtor, loaned the Debtor $50,000.00. Again, the loan documents were signed and witnessed by the officers of the Debtor, and the funds were deposited into the Debtors account. Ocwen's suggestion that the Creditors claims are "highly suspect and may have been manufactured by Ablitt..." are misplaced and inappropriate.

30.    The facts and circumstances of the creditors claims are as follows:

a.    Summit Title Corporation - Summit Title Corporation is wholly owned by Nicole Ablitt, the Petitioners wife. The Petitioner is the acting President of the corporation. Summit Title Corporation has been providing title and abstract services since 2003. Summit Title Corporation is still owed approximately $4,071,376.64 by the Debtor. The Debtor has collected most of the fees from its clients but has failed to forward the funds to the Summit. The Debtor would order upwards of approximately $250,000.00 of title and abstract work a month from Summit. During the period of May 16, 2013 through July 4, 2014 the Debtor would remit less that $28,000.00 per month in payments.

b.    Etoile Corporation is a children's boutique owned by Nicole Ablitt. The Debtor in desperate need of funds to meet payroll obligations asked Steven

---

[4]The Debtor also charged approximately $51,000.00 on the Petitioners credit cards without payment.

and Nicole Ablitt for a short-term loan. Nicole Ablitt decided to give the Debtor a loan through Petite Etoile. The length of loan was suppose to be less than 14 days. The loan was never repaid. John Connolly executed the note and it was witnessed. The funds were accepted by the Debtor and deposited into its account.

    c.    Pioneer Title and Abstract Company, LLC was opened in NH to provide Title and Abstract services in NH. Like Summit Title, the company provides title and abstract services to the Debtor. The Debtor order $4,500.00 in title services but failed to make a single payment.

    d.    See copies of the notes payable to Steven Ablitt.

31. Steven Ablitt was the President of the Debtor from 2003 through May 16, 2014. Steven Ablitt attaches an affidavit which confirms the use of Summit Title Corporation by the Debtor.

32. See paragraph 30 (b).

33. Documents in support of the claims are attached hereto.

34. The claims are valid claims.

35. The Petitioning Creditors do hold valid claims and as such satisfy the requirements under section 303(b). The Involuntary Petition was filed in accordance with 303(a) of the Bankruptcy Code.

36. Ocwen has not shown a single indicia of evidence that would indicate that the Petitioner did not file the Involuntary Petition in bad faith. Ocwen arguments are based on bad assumptions and are not supported by the facts in the case. It only goes to show the importance of getting an accounting of the Debtor completed.

WHEREFORE, Steven Ablitt respectfully requests that the Court grant the following:

1. Allow the entry of the order for relief in the Involuntary Case;

2. Deny Ocwen's Motion to Dismiss the Involuntary Case for "cause" under section 707(a) of the Bankruptcy Code; and

3. Grant such further relief as the Court deems proper.

/s/ Steven Ablitt

Steven Ablitt, [BBO 641316]
6 Ramsdell Way
Lynnfield, MA 01940
617-905-4715